Herman **KRAUSE** and Willie Moore, on behalf of themselves and all others similarly situated, and We Are Inmates Too, an unincorporated voluntary association, Plaintiffs,

v.

Wilbur J. **SCHMIDT**, individually and in his capacity as Secretary of the Department of Health and Social Services, et al., Defendants.

No. 71–C–450.

United States District Court,
W. D. Wisconsin.

April 10, 1972.

As Amended April 25, 1972.

John F. Ebbott, Milwaukee, Wis., for plaintiffs.

Mary V. Bowman, Asst. Atty. Gen., for defendants.

## OPINION AND ORDER

JAMES E. DOYLE, District Judge.

Plaintiffs are presently incarcerated in the Wisconsin State Reformatory in Green Bay, Wisconsin. Pursuant to administrative disciplinary hearings, each of them is currently confined for an indefinite period in a "segregation unit" of the Reformatory. Plaintiffs have brought this suit for injunctive and monetary relief on behalf of themselves and all other inmates at the Reformatory similarly situated. Rule 23, Fed.R. Civ.P. Presently before this court is plaintiffs' motion for a preliminary injunction requiring the defendants to release them forthwith from segregation and to provide them with certain specific procedural safeguards at any subsequent disciplinary hearing.

For the purpose of this motion, and only for this purpose, I find as fact those matters stated below in the opinion under the heading "Facts".

## FACTS

The Wisconsin Division of Corrections has promulgated a set of procedures to govern the operation of intra-institutional disciplinary hearings. Manual of Adult Institutions Procedures, §§ 5.9, 5.10 (Revised October, 1967; August, 1971). At all times material to this action, such procedures were in effect at the Green Bay Reformatory. The procedures provide that all inmates "cited for other than minor breaches of discipline", will be brought before a disciplinary committee. The committee is to be composed of three members, the Associate Warden of Security, the Associate Warden of Treatment, and a rotating member from the general staff. Sec. 5.9(a). Proceedings before the committee may be instituted only by the filing of a written complaint with a member of the committee by either a corrections officer or a staff member. Sec. 5.9(c). Committee sessions are held at such intervals "as will assure prompt disposition of all cases." Sec. 5.9(b). No form of punishment is to be administered prior to committee action "except for proper restraining measures in unusually serious incidents." Sec. 5.9(b). The committee considers only written reports signed by the staff member or officer bringing the complaint. The written report presented to the committee is given to the inmate, "if at all possible," several hours prior to his appearance before the committee (Modification #1, revision of August, 1971); the accused inmate is given the opportunity to appear before the committee, to present statements to the committee, answer any questions of committee members, and provide any information sought by the committee. Sec. 5.9(c). After taking the evidence, the committee may deliberate privately and announce its decision to the inmate immediately thereafter. Sec. 5.9(d). The action of the commit-

tee is documented in a prescribed space on the original conduct report "with a concisely written statement (one or two sentences) giving justification for the action taken." (Modification # 4, revision of August, 1971.) Should the inmate wish to appeal the committee's action, the committee is to submit its findings to the Warden or Superintendent for final decision. Sec. 5.9(a).

The rules recited above constitute the entire set of written procedures governing the conduct of disciplinary hearings at the Reformatory. Neither the Manual of Adult Institutions Procedures nor any of the amendments thereto provide any further procedures.

Section 5.10 of the Manual of Adult Institutions Procedures empowers the disciplinary committee to impose sanctions on an inmate adjudged guilty of a misconduct charge. The Manual of Procedures does not list the range of possible punishments, but in practice, two of the more serious sanctions imposed are confinement in "lower segregation" and confinement in "upper segregation."

An inmate in the general population rooms in a cell of "adequate" size and sleeps on a bed of "some comfort." He is permitted to retain certain personal toiletries, such as soap, a shaving kit, toilet paper, towels, a toothbrush, toothpaste and shampoo. He may either attend school at the reformatory or participate in a reformatory work program. If he chooses to work, he earns money for the work performed. He is allowed to leave his cell for various portions of the day (either for school or work) and, in addition, is permitted to engage in recreation on certain weekdays and weekends. He is allowed to talk with other inmates and, if he remains in the general population, he may accumulate "good time" which will hasten his mandatory release date.

The prisoner confined in "lower segregation" is not permitted to work and thus can earn no money with which to purchase articles sold in the canteen, such as soap, toothpaste and cigarettes. He must sleep on a "hard" bed with just one sheet, a pillow and pillowcase. He is permitted no personal toiletries except a face towel and soap. He may leave his cell for a total of thirty minutes each week. And he may not earn "good time," a factor which delays his mandatory release date. If he is sentenced to "indefinite idle" status in lower segregation, he may be confined there for a period ranging from two to four months.

"Upper segregation" is called "the hole" by administration and inmates alike. The cell size is 12' x 5'; there is a cot with a mattress that is four inches thick; neither sheets nor pillow is provided for the cot. In the cell there is a bare light bulb that is always turned on, thus making it difficult to sleep. No toiletries are allowed: inmates must ask the guard on duty for soap and for toilet paper. The only reading matter permitted in the cell is the Bible, and no radios are allowed. The prisoner is not permitted to exercise; nor is he allowed to leave his cell. He may talk with no one (if he is caught speaking, he is penalized with another day in "the hole"). No money can be earned and no good time may be accumulated.

Misconduct "convictions," no matter what the sanction imposed for them, are referred to the parole board and affect adversely the inmate's application for parole.

On November 12, 1971, plaintiffs were reported to the disciplinary committee for alleged infractions arising out of a disturbance that occurred at the Reformatory on the evening of November 12. The charges against the plaintiffs were heard by the disciplinary committee on November 19, 1971. The members of the committee were Donald Clusen, Associate Warden Security, Kenneth Mathys, Associate Warden Treatment, and Robert Rosera, a corrections officer. On the morning of November 19, two or three hours in advance of their hearings, plaintiffs were given copies of the conduct reports filed against them. Each plaintiff had a private hearing before the committee, at which the conduct report was read to

him. Each was given an opportunity to explain his actions and was asked questions by members of the committee. After hearing the plaintiffs and deliberating privately, the committee found plaintiff Krause guilty and sentenced him to indefinite idle in the lower segregation unit and found plaintiff Moore guilty and sentenced him to ten days in the upper segregation unit, followed by confinement in the lower segregation unit under indefinite idle status.

## OPINION

Jurisdiction is present. 42 U.S.C. § 1983; 28 U.S.C. § 1343(3).

On a motion for a preliminary injunction, the movant must show that he is suffering irreparable harm and that he has a reasonably good chance to succeed on the merits. I am persuaded that plaintiffs are currently suffering irreparable harm. While life in the general population at the Reformatory naturally entails many restrictions on an inmate's freedom, confinement in either upper or lower segregation constitutes a deprivation of many, if not most, of those remaining freedoms which are highly valued in the prisoner's world. The loss of accumulated good time and the adverse affect exerted on applications for parole are two other significant hardships imposed upon plaintiffs. Thus, each day spent in segregation causes plaintiffs to suffer harms that are distinct and irreparable.

With respect to the plaintiffs' chances for ultimate success in this action, I refer initially to an opinion entered by this court in Morales v. Schmidt, 340 F. Supp. 544, 1972. As indicated there, I consider that the interest of an individual in fair procedures as a precondition to the imposition of serious sanctions is a fundamental interest. When the government undertakes to create a class of persons who have been convicted of crime and a class of persons who have not been convicted of crime, and to distinguish between these two classes with respect to fair procedures, the burden is upon the defendant officials to show a

compelling governmental interest in enforcing the distinction. For the reasons set forth in this opinion, I conclude that the defendants have not yet made such a showing. Of course, they may ultimately be able to do so. But on the showing thus far made, the chance appears reasonably good that the plaintiffs will ultimately prevail.

Plaintiffs rely on Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and recent decisions applying *Goldberg* to prison disciplinary hearings. Plaintiffs contend that *Goldberg* teaches that procedural due process must be provided whenever an individual is subject to "grievous loss" at the hands of the state or its instrumentalities; that the penalties imposed by the discipline committee at the Reformatory subject the plaintiffs to grievous loss, as defined in *Goldberg*; and that therefore the disciplinary committee's hearings must comport with the standards of "rudimentary due process" set forth in *Goldberg*. *Goldberg* states that the following elements comprise the rudiments of due process: (1) an opportunity to be heard; (2) timely and adequate notice of the proposed hearing; (3) an effective opportunity to confront adverse witnesses and to present arguments and evidence orally; (4) the right to be heard by one's counsel; (5) an impartial decisionmaker; and (6) a decision whose conclusions rest solely on evidence adduced at the hearing and which states the reasons for the decisionmaker's determination and indicates the evidence upon which he relied. 397 U.S. 254, 267–271, 90 S.Ct. 1011, 25 L.Ed.2d 287. Plaintiffs argue that the hearings at which they were "convicted" failed to conform to *Goldberg* in the following respects: (1) the plaintiffs were not given adequate and timely notice of the charges against them; (2) they were not granted the right to confront and cross-examine adverse witnesses; (3) they were not permitted to retain counsel or substitute for counsel; (4) they were not tried by an unbiased fact-finder; and (5) they were not provided with a meaningful written deci-

sion based on the evidence. These failures, plaintiffs submit, deprived them of "rudimentary due process" and make it probable that they will succeed on the merits.

The plaintiffs' challenge goes solely to the adequacy of the procedures employed by the disciplinary committee at the hearings provided for in Section 5.9 of the Manual of Adult Institutions Procedures. They do not challenge the constitutionality of that portion of Section 5.9 of the Manual which empowers the disciplinary committee to impose "emergency" punishment prior to committee action "in unusually serious incidents." Sec. 5.9(b).

Defendants do not dispute plaintiffs' contention that the disciplinary hearings in question did not include all of the rights enumerated in *Goldberg*. Defendants also acknowledge that some jurisdictions have held that prison disciplinary hearings must include all of the elements set forth in *Goldberg*. They contend, however, that due process at disciplinary hearings, as defined by the Court of Appeals for the Seventh Circuit, has been extended narrowly and that there is thus a strong possibility that ultimately plaintiffs will fail on the merits.

In Goldberg v. Kelly, *supra*, the Supreme Court was faced with the question whether the due process clause of the Fourteenth Amendment requires a state that terminates public assistance payments to a particular recipient to afford him the opportunity for an evidentiary hearing prior to termination. In answering affirmatively the question for decision, the majority stated that procedural due process must be provided to all "[who] may be 'condemned to suffer grievous loss' " at the hands of a state or its instrumentality. 397 U.S. at 263, 90 S.Ct. at 1018 (quoting from the concurring opinion of Frankfurter, J. in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 [1951]). The Court noted that the process due in a particular instance would depend upon the cir-

cumstances but that, in the context of the pre-termination welfare hearing, only the "minimum procedural safeguards . . . demanded by rudimentary due process" were required. 397 U.S. at 267, 90 S.Ct. at 1020. The "minimum procedural safeguards" were described as consisting of "timely and adequate notice", at 267, 90 S.Ct. 1011; the right to present evidence orally, at 268, 90 S.Ct. 1011; the right to confront and cross-examine adverse witnesses, at 269, 90 S.Ct. 1011; the right to retain counsel, at 270, 90 S.Ct. 1011; the right to a reasoned statement of the decisionmaker's determination, at 271, 90 S.Ct. 1011; and the right to an impartial decisionmaker, at 271, 90 S.Ct. 1011.

Several recent decisions have applied *Goldberg* to the context of the prison disciplinary hearing. Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); and McCray v. Maryland, 40 L.W. 2307 (Cir. Ct. Montgomery Co. Md., 1971). Of those, Clutchette v. Procunier, *supra*, is most analogous to the case at bar. The court there found that "violations punishable by indefinite confinement . . . in . . . segregation," "violations which may result in . . . a . . . forfeiture," and "violations which may result in any type of isolation confinement longer than ten days" involved losses sufficiently serious to require that plaintiffs be provided some procedural safeguards. 328 F. Supp. at 781. After considering closely the language of the *Goldberg* opinion, the court determined that in describing the elements of "rudimentary due process", the Supreme Court was establishing in *Goldberg* a basic minimum of procedural rights. Since the disciplinary proceedings afforded plaintiffs in *Clutchette* fell below the *Goldberg* standards, the court held that plaintiffs had been denied due process and ordered that future disciplinary hearings must conform to the *Goldberg* rules. Id., at 782–784.

The majority in *Goldberg* was careful to note that the procedural safeguards enumerated were the "minimum" and

that no less than the minority, it recognized "the importance of not imposing upon the States or the Federal Government in this developing field of law any procedural requirements beyond those demanded by rudimentary due process." 397 U.S. at 267, 90 S.Ct. at 1020.

In the case at bar, I am persuaded that plaintiffs are subject to "grievous loss" within the meaning of *Goldberg*. Sanctions entailing forfeiture of good time or confinement in either upper or lower segregation are sufficiently serious to require that the hearings imposing such sanctions be conducted according to the principles outlined in *Goldberg*. In the instant case, however, it is impliedly conceded by defendants that the hearings did not provide plaintiffs with all of the *Goldberg* safeguards, and defendants do not contend, and offer no evidence, that the plaintiffs voluntarily relinquished any of these safeguards with knowledge that they were entitled to them. For the purpose of the motion for a preliminary injunction, I find and conclude that the plaintiffs were not afforded the right to retained counsel or counsel-substitute and the right to cross-examine adverse witnesses, and that there was no waiver by the plaintiffs of their rights to those two safeguards. I refrain from any conclusion of law with respect to whether the procedures actually followed in the plaintiffs' cases embodied the remaining safeguards required by *Goldberg*. *Goldberg* requires that all of the minimal procedural safeguards be present at a hearing that could result in grievous loss. Thus, unless decisions of the Seventh Circuit compel a different conclusion, I am prepared to conclude that plaintiffs are "subject to grievous loss"; that they were entitled to a hearing providing the procedural minima enunciated in *Goldberg*; that they did not receive all of the minimal procedural safeguards; and that therefore they have a considerable likelihood of success on the merits.

The defendants contend that the Court of Appeals for the Seventh Circuit would not apply *Goldberg* to prison disciplinary hearings. They point specifically to three of that Court's decisions. They argue that United States ex rel. Knight v. Ragen, 337 F.2d 425 (7th Cir. 1964), Hahn v. Burke, 430 F.2d 100 (7th Cir. 1970), and Adams v. Pate, 445 F.2d 105 (7th Cir. 1971) stand for the proposition that a reasonable opportunity to be heard "does not necessarily include all the accoutrements of a trial" and can be satisfied by a hearing that provides something less than the elements demanded by these plaintiffs. Defendants submit that by Seventh Circuit standards, these plaintiffs' constitutional procedural rights were adequately protected by the hearings which they were afforded.

I am persuaded that the decisions of the Court of Appeals for the Seventh Circuit are inapposite to the issues at bar and do not require me to reach a different conclusion from the *Clutchette* court. In United States ex rel. Knight v. Ragen, *supra* (1964), the court held that no federal cause of action was stated by allegations that a prison inmate had been arbitrarily placed in isolation. But this decision preceded Goldberg v. Kelly, *supra* (1970), and a spate of decisions applying increased scrutiny to practices in state prisons. See Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal. 1966); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Cal.1970), affirmed sub nom. Younger v. Gilmore, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971); Carothers v. Follette, 314 F. Supp. 1014 (S.D.N.Y.1970); Graf v. State of Wisconsin, Dept. of Health & Social Services (Schmidt), 319 F.Supp. 305 (W.D.Wis.1970); Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio, 1971); Clutchette v. Procunier, *supra* (1971). The obsolescence of the *Knight* case is hinted at by defendants in their brief (". . . the court of appeals has probably altered its position somewhat in the ensuing seven years; . . ..") and ef-

fectively precludes that case from exerting any precedential influence on the matter at bar.

The *Knight* holding is made even more tenuous by the recent decision of the Supreme Court in Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). There, the Supreme Court reversed and remanded a decision of the Seventh·Circuit Court of Appeals which affirmed a lower court dismissal, for failure to state a claim, of a prisoner *pro se* complaint that alleged, *inter alia,* that the plaintiff had been denied due process in the steps leading to his disciplinary confinement.

Hahn v. Burke, *supra* (1970), is cited by defendants for the proposition that "a 'reasonable opportunity to be heard' does not necessarily include all the accoutrements of a trial." In *Hahn,* plaintiff claimed that his probation had been revoked without a hearing at which he could have challenged the accusations that resulted in the revocation. The question for decision was whether plaintiff was entitled to any hearing prior to his parole revocation; the court's answer was that a hearing was compelled. The question of the adequacy of any particular hearing was not litigated in *Hahn*; it was simply determined that some hearing must be given.

Since *Hahn,* however, the Court of Appeals for the Seventh Circuit has decided Scarpelli v. Gagnon, 454 F.2d 416 (1971). In *Scarpelli* the Court was faced with the question, *inter alia,* whether retained counsel must be allowed to participate in the probation revocation hearing required by *Hahn.* Citing Goldberg v. Kelly, the court noted that:

> "We have no difficulty in recognizing the significance of the probationer's stake in a revocation hearing, such that counsel obtained by the probationer must be admitted to the hearing and permitted to represent his client." (footnote omitted) (at p. 421).

Thus, *Scarpelli* extends one of the *Goldberg* safeguards to the probation revocation hearing and vitiates completely defendants' argument that *Goldberg* has been applied narrowly by the Seventh Circuit.

Adams v. Pate, *supra* (1971), involved two consolidated appeals, one by Adams, another by Miller, both of whom were inmates at a state penitentiary. In the Adams case "on the defendant's Rule 12(b) (6) motion supported by affidavit, [the district court had] dismissed the complaint for failure to state a claim upon which relief can be granted." 445 F.2d 105, 107. It is not clear whether the district court had treated defendant's motion as a motion for summary judgment under Rule 56, but the opinion of the Court of Appeals makes reference to the "complaint, as supplemented by additional averments contained in the response Adams filed to the defendant's motion to dismiss. . . ." *Id.*

Adams sought recovery of money damages against the warden, on the theory of *respondeat superior,* for alleged beatings administered to him by a prison guard and for confinements in segregation that had allegedly been imposed upon him in violation of his due process rights. The complaint failed to allege any personal involvement or knowledge on the part of the warden. The court held that absent an allegation of the warden's personal involvement or knowledge, plaintiff's complaint failed to state a claim for money damages. 445 F.2d 105, 108.

Defendants contend, however, that *Adams* should be read to sanction a prison disciplinary hearing involving fewer than all of the procedural elements catalogued in *Goldberg.* They point to the following language:

> "The usual institutional procedure [at the penitentiary] is that prior to the imposition of confinement in segregation, the prisoner is to be taken before the Disciplinary Captain for a hearing and determination of guilt or

**1008**

innocence, and if found guilty, to have him designate the punishment. It thus appears that the prisoner is confronted with the accusation against him and afforded a reasonable opportunity to deny the accusation or explain his actions. In the context of the nature of the administrative action here involved, this would appear to fairly and rationally satisfy the concept of procedural due process." *Id.,* at 108.

The focal point in Adams' case was the sufficiency of the allegations of his complaint, not the adequacy of the procedures by which he was confined in segregation. The court's observations on the due process afforded Adams were unnecessary to decision: the language used by the court to introduce its discussion of the procedures—"it thus appears"—indicates that the segment of *Adams* quoted above is dictum. Moreover, it is apparent from footnote 4 of the opinion that the court was provided with the briefest of factual descriptions of the disciplinary hearings provided Adams: the description of "the usual procedure" for disciplinary hearings was taken from an allegation contained in Adams' response to defendants' motion to dismiss. No factual inquiry was made into the question of "grievous loss"; no analysis was made of the effect of *Goldberg* on prison disciplinary hearings.

Similarly, the *Miller* case did not confront the court with the question of the adequacy of certain procedures employed at prison disciplinary hearings. Miller raised two due process challenges to the procedure that resulted in his confinement: in the district court, he alleged that the Disciplinary Captain who had sentenced him was disqualified to hold office under the Illinois Constitution; on appeal, he asserted for the first time that the sentencing and hearing themselves were procedurally defective. The court dismissed his first challenge as "patently frivolous", since it involved exclusively a question of state law, and with respect to his second contention,

held that Miller had failed to allege in the trial court any facts which could serve as a basis for the claim. *Id.,* at 108.

Consequently, the *Adams* case does not represent a holding by the Court of Appeals for the Seventh Circuit on any substantive aspect of the question of the extent of due process owed at prison disciplinary hearings. Neither that decision, nor any of the others cited by defendant, indicates that ultimately plaintiffs will fail on the merits of their claim. Moreover, the *Scarpelli* decision, in relying on *Goldberg* to establish a right to retained counsel at probation revocation hearings, enhances the likelihood of plaintiffs' eventual success.

Therefore, I am convinced that plaintiffs are currently suffering irreparable harm and that they are likely to succeed on the merits of their claim. The preliminary injunction must issue.