**UNITED STATES of America ex rel. Sheridan R. JONES**

v.

**Alfred T. RUNDLE, Superintendent, Gerald L. Lightcap, Dept. Super.**

**Civ. A. No. 71-74.**

United States District Court,
E. D. Pennsylvania.

May 10, 1973.

Ralph Spritzer, Philadelphia, Pa., Supervising Atty., Robert H. Ament, Legal Intern, Prison Research Council, University of Pennsylvania Law School, Philadelphia, Pa., for plaintiff.

Michael Minkin, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

BODY, District Judge.

In this action, the plaintiff, Sheridan R. Jones, alleges that the defendants under color of state law denied him his rights to procedural due process in a prison disciplinary hearing and thereafter confined him in punitive segregation which violated his right to be free from cruel and unusual punishment. The hearing concerned an alleged violation of prison rules. The plaintiff's cause of action arises under the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1970), and jurisdiction is founded upon 28 U.S.C. §§ 1335, 1343 (1970). Plaintiff seeks monetary damages to compensate him for the denial of his rights and equitable relief for expungement of this incident from his record so he will suffer no further adverse consequences from the incident.

Plaintiff's complaint survived motions for dismissal and summary judgment, and a trial was held without a jury on March 19, 1973. The following are the findings of fact reached at that trial.

### FINDINGS OF FACT

1. Sheridan R. Jones was born in New York City, New York.

2. Between November 1, 1970 and February 1, 1971 and at all other times relevant to this lawsuit, the plaintiff, Sheridan R. Jones, a Caucasian, was incarcerated at the Pennsylvania State Correctional Institution at Graterford, Pennsylvania.

3. Between November 1, 1970 and February 1, 1971 and at all times relevant to this lawsuit, John Vann, a Black, was incarcerated at the Pennsylvania State Correctional Institution at Graterford, Pennsylvania.

4. At all times relevant to this proceeding, Alfred T. Rundle was the Superintendent of the Correctional Institution at Graterford, Pennsylvania.

5. At all times relevant to this proceeding, Gerald L. Lightcap was the Deputy Superintendent at the Correctional Institution at Graterford, Pennsylvania.

6. On November 21, 1970 two prison guards, Sergeant Gene Wilfong and Officer Wengiel, found Sheridan R. Jones lying naked on his back in the cell of inmate John Vann, Cell 244, D-Block. John Vann was present in the cell at this time. There was no testimony stating whether John Vann was clothed.

7. Sheridan R. Jones was taken immediately to the dispensary for a medical examination.

8. On the same day, Sergeant Wilfong wrote a Misconduct Report regarding the incident. (Plaintiff's Exhibit 1) The misconduct listed in the report was "suspicion of an act of sodomy."

9. At the time of this incident, Sheridan R. Jones was earning twenty-five cents ($0.25) per day as an Administration Janitor.

10. After the medical examination, Sheridan R. Jones was locked in his cell pending a Behavior Clinic.

11. On November 22, 1970, plaintiff was taken before Major Parcell for a preliminary hearing. At this hearing, Major Parcell read the Misconduct Report to the plaintiff. The report contained all the charges against him. Sheridan R. Jones was then permitted to make a statement giving his position regarding the misconduct: he said that he was in John Vann's cell getting a book and that he was not naked.

12. Major Parcell then investigated those parts of the report which Sheridan R. Jones disputed. The investigation consisted of calling in Sergeant Wilfong and asking him if the report was true. Sergeant Wilfong said it was.

13. At the State Correctional Institution at Graterford, hearings to dispose of cases of prisoner misconduct were called the Behavior Clinic. At each Clinic, five prison officials were present to decide the case. A majority vote of the members determined the outcome. The general procedure was that the charges were read and the prisoner was then allowed to give his account of the

incident. It is uncertain whether prisoners ordinarily were allowed to present evidence at the Clinic other than their own testimony. Attorneys were not provided, and prisoners were not permitted to confront and cross-examine their accusers. There was no avenue of appeal within the prison system.

14. Defendant Gerald L. Lightcap presided over the Behavior Clinic which met on November 23, 1970 to consider the Misconduct Report on Sheridan R. Jones and John Vann. The identity of the other members of this Clinic is now uncertain, but five prison officials attended the Clinic.

15. At the Clinic the usual procedures were followed except the plaintiff, Sheridan R. Jones, and John Vann were not permitted to explain their actions. At the trial John Vann testified that they were not permitted to speak at all, and Sheridan R. Jones testified that he tried to speak, got one sentence out, and then was cut off. These stories do not seriously contradict each other. The Commonwealth brought in no witness who was present at the Clinic to contradict the evidence offered by plaintiff.

16. The person who told the plaintiff and John Vann not to speak is not one of the defendants. It was another unidentified prison official present at the Clinic who was not sued by plaintiff.

17. The only investigation described by the testimony which the Clinic members undertook before the hearing was an oral communication from Major Parcell describing the preliminary hearing he conducted and his conversation with Sergeant Wilfong. No evidence related what was done with any medical records giving the results of the examination of Sheridan R. Jones immediately after the incident except a statement by Major Parcell that such reports were usually given to the Clinic members.

18. The Clinic which considered the Misconduct Report against Sheridan R. Jones and John Vann lasted less than five minutes and at the end of the hearing, the offenders were taken to punitive segregation for thirty days.

19. The actions taken against Sheridan R. Jones and John Vann were not a result of any racial bias of the prison officials.

20. Defendant Alfred T. Rundle did not attend the Behavior Clinic, nor was he aware of what took place at this particular Clinic, nor does the report he signed on its face give sufficient information to put him on notice that the usual prison procedures were not followed.

21. In punitive segregation, plaintiff Jones was not exercised for the first three days.

22. In the punitive segregation block the cells had no windows. There were no lighting fixtures in the cells and no hot water. The front walls of the cells were made of metal bars and were furnished only with a steel cot, a sink, and a toilet. The cot's mattress was removed during the day. It was winter during plaintiff's stay in punitive segregation, and the heating was not sufficient to keep the cells warm. The temperature was uncomfortably low, but it was not a serious hardship. At times moisture condensed on the walls and floor of the cells.

23. For recreation, the prisoners in segregation were permitted to walk around in a small, outdoor enclosure for a short period of time each day, weather permitting. We do not know the dimensions of the enclosure. These prisoners were not permitted to work.

24. The prisoners in punitive segregation received the same food as the rest of the prison population. The food was less warm when served in punitive segregation cells than it was in the regular dining hall, but it was not cold. The food was served on trays slid through a small hole in the bottom of the cell door. The prisoners in solitary were allowed one cigarette after each meal.

25. During this initial thirty-day confinement in punitive segregation,

fourteen misconduct reports were written up against Sheridan R. Jones. All of these were for refusing to stand for inspection as required by prison regulations.

26. At the end of the thirty-day confinement, on December 22, 1970, the plaintiff was again brought before a Behavior Clinic headed by Deputy Superintendent Lightcap for refusing to stand for inspection. Plaintiff Sheridan R. Jones admitted that he had refused to stand for inspection. The Clinic returned him to punitive segregation for seven more days.

27. Sheridan R. Jones was brought before the Behavior Clinic again on December 29, 1970. At this time, he was offered a job in the laundry at the same pay as his former job as janitor, but he refused to work. He was segregated from the rest of the prison population until he accepted work on April 21, 1971.

### DISCUSSION

The first question is whether plaintiff's constitutional rights were violated. Two legal issues must be resolved to decide this question. First, did the hearing comport with constitutional standards? Second, did the confinement in punitive segregation reach the level of cruel and unusual punishment?

Two recent opinions by the United States Court of Appeals for the Third Circuit set the constitutional standards for safeguards which must accompany the imposition by state prison authorities of substantial punishment. Undoubtedly, the thirty days in punitive segregation which plaintiff in this case received is substantial punishment. The two controlling opinions are United States ex rel. Tyrrell v. Speaker, 471 F. 2d 1197 (3d Cir. 1973) and Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972). The most important language in these opinions, the language which sets the absolute minimum due process standards, is quoted from Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 405 U.S. 978, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972):

"If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him, . . . and afforded a reasonable opportunity to explain his actions." (Citations and footnote omitted.)

■ We hold that in this case, these constitutional standards were violated. The most flagrant violation of the plaintiff's rights was the refusal to allow him to give his side of the story at the Clinic. In view of the findings of fact based on plaintiff's testimony uncontradicted by the State, the conclusion that the hearing was not fundamentally fair or rational is inescapable. One-sided hearings can be neither rational nor fair.

■ A further problem is posed by the medical examination of Sheridan R. Jones immediately after the incident. If it is assumed that a report was made and it showed that Sheridan R. Jones had engaged in an act of sodomy and the Clinic members read the report, they failed to inform him of the evidence against him. On the other hand, if the Clinic members were unaware of the report or if in fact no such report existed, then the only investigation of the relevant facts was conducted by Major Parcell who did not participate in the Clinic. The Clinic's findings then were based solely on the Misconduct Report itself and one-sentence questioning of Sergeant Wilfong by Major Parcell about whether the Misconduct Report was true. Officer Wengiel was not questioned. This investigation could hardly be called a sufficient, independent investigation for a rational determination of facts. Lathrop v. Brewer, 340 F.Supp. 873, 880–881 (S.D.Iowa 1972). See Landman v. Royster, 333 F.Supp. 621,

653 (E.D.Va.1971). The Clinic's conduct was an abdication of its duty as fact-finder. Consequently, whether or not the Clinic examined a medical report, there was a further deprivation of constitutional rights.

The plaintiff believes that the due process clause guarantees him other safeguards. First, he believes he is entitled to confront and cross-examine his accusers, citing Goldberg v. Kelly, 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); United States ex rel. Neal v. Wolfe, 346 F.Supp. 569, 575 (E.D.Pa. 1972). He also argues that he is entitled to call witnesses and present other evidence in his own behalf, citing Colligan v. United States, 349 F.Supp. 1233, 1237 (E.D.Mich.1972); Krause v. Schmidt, 341 F.Supp. 1001 (W.D.Wis. 1972). Further, he argues that counsel or counsel-substitute should be permitted, citing *Colligan* and *Krause*. In addition, he believes that the state is required to provide a means of administrative appeal, arguing from *Tyrrell* and *Gray* that administrative review is necessary for a rational fact determination. The general thrust of these arguments and the cases cited is that the procedural safeguards required by the United States Supreme Court in Goldberg v. Kelly, supra, which a state must follow before cutting off welfare benefits should be also required in the prison disciplinary hearings at least in cases of substantial deprivations.

We believe, however, that the decisions which require the *Goldberg* safeguards in prison disciplinary hearings are not as persuasive as they once were in this Circuit. *Gray* and *Tyrrell* now delineate the due process standards regarding prison discipline and we shall look primarily to them for guidance in this opinion. The Court of Appeals for the Third Circuit, however, did not "suggest what may be the precise requirements of the due process clause in . . . [*Gray*], since the determination of 'what process is due' will necessarily depend on the facts to be developed in the district court on remand." *Gray*, at 185

of 465 F.2d, citing Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).

■ *Gray* and *Tyrrell* do not specifically reject applying *Goldberg* to the prison setting. They rely heavily, however, on an opinion by the Court of Appeals for the Second Circuit, Sostre v. McGinnis, supra. In *Sostre*, the district court had found that the prisoner was entitled to:

> "1) written notice of the charges against him (in advance of a hearing) which designated the prison rule violated; 2) a hearing before an impartial official at which he had the right to cross-examine his accuser and call witnesses in rebuttal; 3) a written record of the hearing, decision, reason therefor and evidence relied upon; and 4) retain counsel or counsel substitute."

Sostre v. Rockefeller, 312 F.Supp. 863, 872 (S.D.N.Y.1970). The Court of Appeals, however, held that each of these safeguards are not necessary at every disciplinary proceeding. "Whether the Constitution requires that a particular right obtain in a specific proceeding depends on a complexity of factors. The nature of the right involved, the nature of the proceeding, and the possible burden of the proceeding, all are considerations which must be taken into account." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960). "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). The only procedural safeguards that a prisoner must be afforded at a disciplinary hearing are those necessary for a rational determination of facts. *Gray* at 185 of 465 F.2d, *Tyrrell* at 1203 of 471 F.2d.

■■ Now we shall examine the procedural safeguards which the plaintiff argues the Constitution requires and decide whether they are necessary for a

rational determination of facts. First, plaintiff argues that he is entitled to confront and cross-examine his accusers. We do not believe that it is necessary that the prisoner cross-examine his accusers. So long as an impartial fact-finder tests the accuser's knowledge of the facts to determine exactly what the accuser knows and how credible his statement is, that is sufficient. An examination by an impartial fact-finder would probably speed up the hearing process, and avoid disruptive confrontations. The ordinary prisoner is not so skilled in the art of cross-examination that preventing him from conducting the cross-examinations will not seriously reduce the reliability of the fact-finding process. We note that the Supreme Court, in Morrissey v. Brewer, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), has held that in a parole revocation hearing, a hearing in which the accused's freedom is at stake, the accused may be prevented from confronting his accuser if the hearing officer finds good reason for doing so. Therefore, the right to confront and cross-examine is not absolute, and has been limited even in more serious hearings. See Lathrop v. Brewer, 340 F.Supp. 873, 881 (S.D. Iowa 1972). The defendants, therefore violated no constitutional standard by not allowing the accused to confront and cross-examine his accusers.

■■ A similar problem is posed by the argument that the prisoner should be allowed to call witnesses in his own behalf. Although here danger of disruption is less when a prisoner calls his own witness, we believe that it is sufficient for the fact-finder to allow the prisoner to suggest that certain witnesses be examined and to state what he believes the results of the examinations will be. If an impartial fact-finder believes that such examinations would lead to relevant and exculpatory evidence, then they must be pursued. So long as an impartial fact-finder makes a reasonable inquiry into the facts, the accused need not personally conduct any prison disciplinary fact-finding investigations.

Fact-finding procedures in which the accused does not call witnesses or conduct examinations have recently been approved in the federal courts. Lathrop v. Brewer, supra.

On the basis of the evidence presented at the trial, we are unable to determine whether the usual Behavior Clinic procedure was to allow the accused prisoners to suggest that the fact-finder question certain witnesses. Therefore, we hold that such safeguards are required, that they were not violated in the customary procedure, but that they were violated in the Clinic held on November 23, 1970.

■ There is no apparent interest of the state in not allowing the accused prisoner to produce whatever documentary evidence he has. Permitting written words will not slow the hearing process or create any possibility of disruption. The record in this case does not indicate that Sheridan R. Jones attempted to bring documents to the hearing or show any documents to the hearing officers nor does it indicate whether prisoners in the customary procedure were allowed to bring documents. Therefore, we find no constitutional infirmity in the hearing on this ground.

■ Plaintiff's next contention is that he has a right to counsel or counsel-substitute. We do not believe that counsel is necessary for a rational determination of facts. Prison disciplinary procedures are not adversary. Rather they are conducted by impartial fact-finders who favor neither side. These people search out facts for both sides, and therefore the hearing can be fair without an expert in presenting evidence being present. There is no prosecutor, so the prisoner need not be protected from a prosecutor's excesses, nor does the prisoner need an attorney to balance the opposing forces. We note also that the United States Supreme Court has not yet decided whether counsel must be permitted at a parole revocation hearing. Morrissey v. Brewer, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). We do not believe that prisoners must be

allowed counsel at a prison disciplinary hearing. The defendants did not violate any constitutional provision by not permitting the accused prisoner a counsel or counsel-substitute.

The last procedural safeguard which the plaintiff has argued for is a method of administrative appeal. We hold, however, that the Due Process Clause of the Fourteenth Amendment does not guarantee a prisoner a right to an administrative appeal from a disciplinary decision. *Gray* and *Tyrrell* require a rational decision from a fair procedure and nothing more. The defendants violated no constitutional requirement by not permitting administrative appeal.

Plaintiff also contends that his hearing before the Behavior Clinic on December 22, 1970 which considered his failure to stand for inspection while in solitary the first thirty days breached constitutional standards. We hold, however, that the requirement of a reasonable investigation was fulfilled when the plaintiff admitted the offenses. Investigating admitted facts is not required by *Gray* and *Tyrrell*.

One argument raised by the defendants is worthy of note at this juncture. Defendants' attorney argued that *Gray* requires that accused prisoners be given *either* notice of charges *or* a hearing but not both. This conclusion is apparently derived from one sentence pulled from its context in the seven-page *Gray* opinion. The sentence, at 185 of 465 F.2d, reads: "But we do hold that the transfer of a prisoner from the general prison population to solitary confinement without either notice of charges or a hearing does not, absent unusual circumstances not evident in the pleadings, meet mininal due process requirements." This argument is without foundation in logic, the law generally, or the *Gray* opinion when read as a whole. It merely serves to illustrate the evils of pulling quotes from their context.

We conclude that the hearing held at Graterford to consider the misconduct of Sheridan R. Jones violated his due proc-

ess rights. The usual procedure was inadequate because he was not informed of the evidence against him. The procedure followed on November 23, 1970 violated constitutional standards even further because the accused was not permitted to deny the incident and explain the circumstances. Moreover, the members of the Behavior Clinic failed to make a reasonable investigation into the facts before reaching a conclusion. The prison officials did comply with constitutional standards to the extent that they provided notice of the charges and gave the accused a reasonable amount of time to prepare any defense he had.

The next question to be resolved is whether the conditions in punitive segregation as proved by plaintiff rose to the level of cruel and unusual punishment. We hold that they did not. "The temporary inconveniences and discomforts incident . . . [to solitary confinement] cannot be regarded as a basis for judicial relief." Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3d Cir. 1969). In *Tyrrell*, supra, at 1202 of 471 F.2d, the Court of Appeals stated conditions "such as the inadequate heating in the cell and the fact that Tyrrell was not allowed out for meals, showers, and short exercise periods, do not present the extreme type of conditions required to establish an Eighth Amendment violation." The conditions described in *Tyrrell* are very similar to those proved here by the plaintiff and are insufficient to prove a violation of the Eighth Amendment. Undoubtedly, the plaintiff's days in punitive segregation were unpleasant. We may even deduce from the fact that it was punitive that it was intended to be unpleasant, but it was neither so bad nor so long in duration that it violated constitutional standards.

Now that it has been determined that the plaintiff was deprived of some of his constitutional rights, we must decide whether plaintiff's proof has satisfied the other elements for a recovery under the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1970). The other elements of a

Section 1983 action are that the plaintiff be a United States citizen or under its jurisdiction, that the defendants be acting under color of state law, and that the defendants caused the deprivation. The plaintiff is a citizen of the United States by birth. At all times relevant to this suit, the defendants were acting in their official capacities and their actions were made possible only because of their official positions. Defendants do not seriously dispute that either of these elements of the statute has been proved.

█ █ There is considerably more disagreement about whether the actions of defendants Rundle and Lightcap caused the deprivation of rights. Superintendent Rundle was not present during any of the particular proceedings against the plaintiff, and he was unaware of any departures from the usual procedures that occurred on November 23, 1970. He was, however, in charge of the prison and was or, in his position, should have been aware that the usual procedure under his supervision did not include informing the accused prisoner of the evidence against him. The procedure denied the plaintiff his constitutional rights. In his position as superintendent, he could have ordered his subordinates to inform the accused of the evidence against him. Applying the common law standard appropriate in Section 1983 cases, that one is liable for the natural consequences of his actions, Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), we hold that defendant Alfred T. Rundle is liable to the plaintiff for the deprivation of constitutional rights. Deputy Superintendent Lightcap was the senior administrator at the Clinic; he ran the Behavior Clinic that met on November 23, 1970. At the Clinic, defendant Lightcap did not personally stop the plaintiff from explaining; another official who is not a party in this case did. The defendant argues that because he did not personally stop the plaintiff from speaking, he did not cause the deprivation of rights. He makes this argument despite the fact that he was in charge of the meeting; he witnessed his subordinate quiet the plaintiff; he did not speak out to stop that action; and he failed thereafter to inform the plaintiff that he had a right to speak. The only possible conclusion is that defendant Lightcap, by failing to correct his subordinate's action at best condoned his conduct and at worst participated in it. Defendant Lightcap is indeed responsible for a deprivation of constitutional rights. See Wright v. McMann, 460 F.2d 126, 135 (2d Cir.), cert. denied 409 U.S. 885, 93 S.Ct. 115, 34 L.Ed.2d 141 (1972); Potts v. Wright, 357 F.Supp. 215, at 218 (E.D.Pa., 1973).

█ The next issue that defendants raise is that they are immune from civil liability under the Civil Rights Acts. Wardens and jailers generally have been held to be immune under the Civil Rights Act for merely keeping people in jail pursuant to a court order. Lumbermens Mut. Cas. Co. v. Rhodes, 403 F.2d 2, 7 (10th Cir. 1968), cert. denied, 394 U.S. 965, 89 S.Ct. 1319, 22 L.Ed.2d 567 (1969). In addition, state administrators, presumably wardens would be included in this classification, are immune from civil rights suit liability for discretionary acts specifically authorized by state statutes. Franklin v. Meredith, 386 F.2d 958, 960–961 (10th Cir. 1967). We note, however, that "the purpose of § 1983 . . . is to provide a federal remedy for the deprivation of federally guaranteed rights in order to enforce more perfectly federal limitations on unconstitutional state action. To hold all state officials immune from suit would very largely frustrate the salutary purpose of this provision. We conclude that the defense of immunity should be applied sparingly in suits brought under § 1983." (footnote omitted) Jobson v. Henne, 355 F.2d 129 (2d Cir. 1966).

█ The limited immunity available to the defendants will not protect them in this case. The allegations against them are not simply for keeping the plaintiff in custody but rather for putting him in punitive segregation without

a proper hearing. Nor does any state statute which has been pointed out to us or which we have found authorize placing a person in solitary confinement for a substantial period of time without a proper hearing. Therefore, the defendants cannot rely on the doctrine of immunity to avoid liability.

Defendants also assert that they are not liable because their actions were taken in "good faith and without improper motive." Generally, however, good faith is not a defense to a civil rights action. Joseph v. Rowlen, 402 F. 2d 367 (7th Cir. 1968). In exceptional cases, however, in which the civil rights action is based on facts which would also support a common law tort action, good faith and absence of an improper motive is a defense to the statutory action if it is also a defense to the tort. See Pierson v. Ray, 386 U.S. 547, 87 S. Ct. 1213, 18 L.Ed.2d 288 (1967); Whirl v. Kern, 407 F.2d 781 (5th Cir. 1968), cert. denied 396 U.S. 901 (1969); C. Antieau, Federal Rights Acts § 89 (1971). The only two tort actions which the complaint might arguably support are false imprisonment and malicious prosecution. With regard to false imprisonment, good faith is simply not a defense. Restatement (Second) of Torts § 44 (1965). Good faith is a defense to malicious prosecution, but the facts do not support a tort action for malicious prosecution. Malicious prosecution is a use of legal process to satisfy one's own malice towards another; it is not a changing or denial of legal process. See 23 Pa.L.Enc. Malicious Prosecution § 1 (1959).

There is one further problem that the plaintiff must overcome in order to gain a verdict. The decision in Gray v. Creamer could be made prospective and applied to disciplinary hearings which occurred after August 14, 1972, the date of the Gray decision. The United States Court of Appeals for the Third Circuit has stated that "Gray and Tyrrell followed courses previously uncharted in this circuit and the full impact of their holdings remains to be defined. Additionally, because of the novelty of their doctrines, the court is yet to be faced with the question of whether there may be only prospective application of their teachings." United States ex rel. Arzonica v. Scheipe, 474 F.2d 720 (3d Cir., 1973) (per curiam), citing Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L. Ed.2d 248 (1969).

Regarding retroactivity, the Supreme Court has:

"firmly rejected the idea that all new interpretations of the Constitution must be considered always to have been the law and that prior constructions to the contrary must always be ignored. Since that time, we have held to the course that there is no inflexible constitutional rule requiring in all circumstances either absolute retroactivity or complete prospectivity for decisions construing the broad language of the Bill of Rights. . . . Rather we have proceeded to 'weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' Linkletter, supra, at 629 [of 381 U.S., 85 S.Ct. 1030]."

Williams v. United States, 401 U.S. 646, 651–652, 91 S.Ct. 1148, 1151, 28 L.Ed.2d 388 (1971). (footnote omitted)

In this retroactivity discussion, monetary damages and equitable relief will be discussed separately. They must be discussed separately because the hardships caused to one party or the other are different for each type of remedy. Because the degree of hardship is different for each type of remedy and because the test for retroactivity is balancing of hardship and effect, the conclusions concerning retroactivity of civil rights action for monetary damages and for equitable relief need not be the same.

We note that the doctrine of retroactivity allows courts considerable

discretion in the method of implementation. For example, when the Court of Appeals for the Third Circuit held that guardians for minors could not be appointed to create diversity, it also held that the rule was to be applied retroactively only if no serious hardship would be imposed on either party or the administration of justice. Siegel v. Slaney, 419 F.2d 176 (3d Cir. 1969). This rule required a case-by-case analysis of hardships rather than an application from a particular date. In addition, the United States Supreme Court has chosen several different dates from which decisions are made prospective and has both allowed and disallowed retroactivity to cases on appeal at the time of the decision. See The Supreme Court, 1965 Term, 80 Harv.L.Rev. 91, 135 (1966).

 We note that all of the recent United States Supreme Court opinions dealing with the retroactivity problem have involved criminal procedures, not civil suits for monetary compensation and equitable relief. See e. g., Williams v. United States, supra, (dealt with *Chimel*); Desist v. United States, supra, (dealt with *Katz*); Linkletter v. Walker, supra (dealt with *Mapp*); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), (dealt with *Escobedo* and *Miranda*); Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), (dealt with *Griffin*); Doughty v. Maxwell, 376 U.S. 202, 84 S.Ct. 702, 11 L.Ed.2d 650 (1964), (dealt with *Gideon*). These cases establish the general rules for determining whether a new constitutional principle should be made retroactive. Generally, a balancing of the effects of retroactivity is necessary. The Supreme Court has stated that the principles of retroactivity apply equally to civil and criminal cases. *Linkletter*, supra, at 627 of 381 U.S., 85 S.Ct. 1731. Therefore, we will undertake the same type of analysis in this case, but other factors will become relevant because the effects of civil remedies may differ from criminal remedies.

Before the doctrine of retroactivity should be analyzed, it must be determined that the teachings of *Gray* and *Tyrrell* are in fact novel. There is little doubt that they are. First, the Court of Appeals for the Third Circuit has stated in *Arzonica*, supra, that *Gray* and *Tyrrell* are novel and follow courses previously uncharted in this circuit. Moreover, it was not until very recently that federal district courts have become more active in supervising prison matters. We believe the landmark case which began the trend was Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y., 1970), aff'd in part, rev'd in part; Sostre v. McGinnis, 442 F.2d 178 (2d Cir., 1971) (en banc). Thereafter, other district courts followed *Sostre*. See, e. g., Landman v. Royster, 335 F.Supp. 621 (E.D.Va., 1971); Lathrop v. Brewer, 340 F.Supp. 873 (S.D.Iowa, 1972); Krause v. Schmidt, 341 F.Supp. 1001 (W.D.Wis., 1972); Colligan v. United States, 349 F.Supp. 1233 (E.D.Mich., 1972). The first case in this circuit to follow *Sostre* is United States ex rel. Neal v. Wolfe, 346 F.Supp. 569 (E.D.Pa. Aug. 7, 1972), which was decided only one week before *Gray*.

These very recent opinions should be compared with opinions handed down about the same time or only slightly before. "[P]rison officials have wide discretion in matters of prison operation and discipline." Negrich v. Hohn, 379 F.2d 213 (3d Cir. 1967). "[W]here the steps taken by the states reasonably maintain discipline, such action is not under the supervisory direction of federal courts." Gray v. Creamer, 329 F.Supp. 418, 420 (W.D.Pa.1971), rev'd, supra. "Discipline reasonably maintained in . . . prisons is not under supervisory direction of the federal courts." Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937 (3d Cir. 1969). "[T]his court cannot conclude that the transfer of an inmate [of a prison] from one wing to another . . . involved any federally protected rights." Hanvey v. Pinto, 441 F.2d

1154 (3d Cir., May 7, 1971). This move was punitive and for disciplinary reasons, and *Hanvey* was handed down approximately one and one-half months after the Second Circuit en banc opinion in *Sostre* and did not cite *Sostre*. We conclude that *Gray* and *Tyrrell* contained new holdings of law in this circuit, and broke with prior, recent decisions.

In Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967), the United States Supreme Court set out the criteria for deciding retroactivity questions:

"(a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

We begin by analyzing the purposes of the *Gray* standards. In neither *Gray* nor *Tyrrell* did the Court state the specific purposes for the new standards. Undoubtedly, the standards represent a whole complex of values that the due process clause represents. One interest served is the interest of society in treating a prisoner fairly; fair treatment in prison will increase the chances of successful rehabilitation by avoiding reactions to arbitrariness. Morrissey v. Brewer, 408 U.S. 471, 484, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Certainly, however, the major reason for providing due process safeguards for prison disciplinary hearings is that irrationally, unfairly determined conclusions are not reliable. The Court of Appeals apparently believed that some prisoners who have broken no rules are placed in solitary confinement. We conclude that the single most important purpose to be served by the new constitutional standards is to increase the reliability of the factfinding process.

This conclusion weighs heavily for retroactivity. Regarding criminal procedure, the Supreme Court has said:

"Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given completely retroactive effect. Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances."

Williams v. United States, 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971). (footnote omitted)

In other opinions, however, the Supreme Court has stated the *Linkletter* test is a balancing test. "[W]hether a constitutional rule of criminal procedure does or does not enhance the reliability of the fact-finding process at trial is necessarily a matter of degree." Johnson v. New Jersey, 384 U.S. 719, 728–729, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882 (1966); The Supreme Court, 1965 Term, 80 Harv.L.Rev. 91, 137 (1966).

In this civil action regarding prison discipline for monetary damages, the fact that the major purpose of the constitutional standards is to increase fact-finding reliability is not as conclusive as it is in criminal procedure. First, the consequences of error are not as severe. The prisoner goes from a restricted environment to a more restricted environment, not from freedom to prison. The stigmas and collateral consequences of a guilty finding are also less. Second, the Supreme Court when deciding whether to make a decision retroactive considers the availability of other safeguards to protect the interests of the parties. The Supreme Court, 1965 Term, supra, at 137. Here, equitable remedies will protect plaintiffs at least partially. See discussion infra.

The second factor to be considered in decisions regarding retroactivity

is "the extent of the reliance by law enforcement authorities on the old standards. . . ." Obviously, the state prison officials relied on statements by various courts that reasonable disciplinary measures taken against prisoners in the day-to-day affairs of the prison were not under the supervisory powers of federal courts. The officials developed disciplinary procedures and conducted their day-to-day affairs with the belief that prisoners were not entitled to due process safeguards. It is apparent that the state officials' reliance on the previous standards was great, and we believe that reliance was reasonable.

 The last factor to be considered is the effect on the administration of justice. We believe that making *Gray* retroactive would have a dire effect on prison systems. For example, we have held that the customary disciplinary procedure used at Graterford violated the Constitution. Although we do not here have occasion to consider the question, the defendants Rundle and Lightcap may be collaterally estopped from defending that the prison procedures did not violate due process. If *Gray* is made retroactive, then Alfred T. Rundle and Gerald L. Lightcap may be personally liable for every minute any prisoner spent in solitary confinement in Graterford Prison within the reach of the statute of limitations. This result would be unconscionably hard on the defendants particularly because they were relying on the then latest holdings of the federal courts. The consequence would be the end of the prison administration because any sensible prison administrator would immediately resign because it would be virtually impossible for him to protect himself from civil liability. He could only protect himself by anticipating what the federal courts with jurisdiction over him might decide at any time in the future within the statute of limitations. For example, if some court at a later time decides that counsel are required for due process at prison disciplinary hearings, the prison administrator

could be held liable retroactively for failing to provide counsel.

 We conclude that to the extent that *Gray* makes new law in this circuit it should not be made retroactive with regard to monetary damages, and we so hold. We further hold, however, that *Gray* should be made retroactive for purposes of equitable relief.

In evaluating whether *Gray* should be made retroactive for equitable relief, one must go through the same analysis as for monetary damages. Clearly, however, neither the purpose of the *Gray* due process standards nor the reliance by state officials changes when a different remedy is considered. Only the effect on the administration of justice is different.

Equitable relief, such as expungement orders and orders for "good-time" credit lost in solitary confinement, will mean changes only in each prisoner's file and recomputation of release date. The burden thus placed on state prison officials will not be onerous and will not discourage competent people from accepting positions of responsibility.

 The only remaining issue is the precise nature of the equitable relief to be granted to the plaintiff, Sheridan R. Jones. The only equitable relief he has asked for is an expungement order. We see no reason why this form of relief should not be granted. The only problem is that the two defendants have left the positions they held at the time this suit was commenced. Therefore, they no longer are in positions in which they could comply with an expungement order. We will grant the plaintiff leave to serve an official of the Commonwealth of Pennsylvania so that an appropriate expungement order may be entered.

We wish to express our gratitude to Robert H. Ament, a law student at the University of Pennsylvania, who was appointed to represent the indigent plaintiff in this case. His excellent written and oral presentations have been of great assistance to this Court.