**Eddie ADAMS et al., Plaintiffs,**

v.

**Norman CARLSON, Director, Federal Bureau of Prisons, et al., Defendants.**

Civ. No. 72–153.

United States District Court,
E. D. Illinois.

April 29, 1974.

See also 7 Cir., 488 F.2d 619; D.C., 352 F.Supp. 882; 368 F.Supp. 1050.

Michael Deutsch, National Lawyers Guild, Jeffrey H. Haas, Dennis D. Cunningham, G. Flint Taylor, Jr., Chicago, Ill., Arpriar G. Saunders, Washington, D. C., for plaintiffs.

Henry A. Schwarz, U. S. Atty., Frederick J. Hess, Asst. U. S. Atty., East Saint Louis, Ill., for defendants.

## ORDER

FOREMAN, District Judge:

This is an action for declaratory and injunctive relief and monetary damages, brought on behalf of a class of inmates at the United States Penitentiary, Marion, Illinois (hereinafter "Marion"), raising significant questions under the United States Constitution concerning *inter alia* cruel and unusual punishment, due process safeguards for men placed into punitive segregation, and the Constitutional rights of those inmates in segregation. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331(a) and had previously certified this matter to be a class action.

The Plaintiff class, including the four-named plaintiffs, were inmates who had been placed in the segregation units at Marion on or about July 23, 1972.

Defendant, Norman A. Carlson, is Director of the Federal Bureau of Prisons, United States Department of Justice and, as such, has direct responsibility for and control over the policies and practices of the Federal Bureau of Prisons. Defendant, George W. Pickett, was Warden of Marion. Defendant Fenton was formerly an Associate Warden and Defendant Buzzard is the Chief Correctional Supervisor at that institution. The events leading to this litigation began with work stoppages and disturbances within the prison on July 17, 1972, and July 24, 1972, and a subsequent fire and general disturbance in the segregation unit on August 17 and 18, 1972. For a more complete description of the events which preceded this litigation, see this Court's earlier opinion at 352 F.Supp. 882.

The Court first heard this matter upon the Plaintiffs' motion for a temporary restraining order, for which a hearing was held and the motion was denied. Subsequently, a two-day hearing was held on November 2 and 3, 1972, upon Plaintiffs' motion for a preliminary injunction. This Court rendered its opinion on January 15, 1973, granting in part and denying in part the relief sought.

Plaintiffs appealed that decision to the United States Court of Appeals for the Seventh Circuit which on August 23, 1973, remanded the case for further proceedings. Adams v. Carlson, 488 F.2d 619 (7th Cir., 1973).

This Court issued a subsequent order on September 7, 1973, further interpreting the Due Process requirements enunciated by the Seventh Circuit and requiring that prison officials hold new hearings to conform with the newly announced standards for all members of the Plaintiff class still in the segregation units. The order also required the prison officials to remove the partition and phones from the present attorney-client visiting room or provide a new room without a partition for the Plaintiffs to confer with their attorneys. It also required that all legal material be returned to the members of the Plaintiff class.

Pursuant to the order of September 7, 1973, the prison officials held new hearings for the 49 Plaintiffs then remaining in segregation. These hearings which were held September 17–21, 1973, encompassed 112 alleged rule infractions. The 49 Plaintiffs were found to have committed all 112 rule infractions and all Plaintiffs were retained in segregation. At the new hearings, the Plaintiffs requested a total of 143 witnesses. Only one or two were actually called as witnesses before the Adjustment Committee. In addition, one member of the Committee did interview several other prospective witnesses. In requesting witnesses, each accused inmate submitted a brief statement of the expected testimony of his prospective witnesses. The usual practice of the Committee was to find that it was unnecessary to call the witnesses and to accept the summary of testimony as if it were a sworn statement. Prison employees did not testify at the hearings and inmates were not allowed to confront or cross-examine their accusors. Plaintiffs were given 24 to 36 hours notice of the charges against them prior to the time of the hearing. Plaintiffs were not represented by counsel at the hearings, although some Plaintiffs requested such representation. The attorneys for the Plaintiffs in this litigation wrote the Defendants and asked that they be permitted to represent members of the class without payment, but this request was denied.

There was a written memorandum report of each hearing. Notes were taken in longhand and later typed by one of the prison personnel. There were no verbatim records of the proceedings before the Adjustment Committee. The record of the proceedings for each Plaintiff consisted of a copy of the incident report, the decision memorandum, the investigator's report, and the inmate's list of requested witnesses. The hearing memorandum shows the manner, time and date on which these inmates were given notice of the charges which they would be required to answer. The reports also indicate the approximate time and date each Plaintiff appeared before the Committee.

The members of the Adjustment Committee were Associate Warden Johnson, in charge of Custody and Operations, Associate Warden Frey, and Lt. Shields. All Plaintiffs were given indefinite sentences for the offenses they were found to have committed.

Lt. Wilcott was the investigator for all 112 charges for the 49 rehearings, despite the fact that at the hearing there was unrebutted testimony that Wilcott had been involved in the August disturbances at H Unit, one of the two segregation units. Those disturbances formed the basis of some of the charges which he investigated.

The report of the investigator did leave much to be desired. For his report concerning one of the charges against Rafael Miranda, the investigator's sole notation under the comments and conclusion section was "as per the reporting officer Miranda must have been agitating or otherwise there would have been no reason to write a report." For one of the charges against Leon Bates, he wrote, in part, " . . . obviously a report would not have been written if the officer had not believed the incident would happen." For another report he concluded, "Since the inmate elected to discuss this report with the Committee it must at this time be concluded the report is true until proven false by him." Wilcott occasionally talked to prison employees, but does not appear to have contacted any of the witnesses requested by the inmates. His interview with prison officials appears to be little more than an affirmation of the incident report. There is no indication that the investigator asked any probing questions or sought any supporting facts. On several occasions, the investigator interviewed only the accused inmate and after listening to that inmate's denials, concluded that the inmate was guilty.

Each inmate who attended the new hearing was allowed to make a statement in his defense. There was no showing that any of the committee members had reported, investigated, or was in any other way involved in any of the charges against the inmates.

The Court held a hearing on the Plaintiffs' motion for a permanent injunction in Benton, Illinois, on November 26–29, 1973.

Subsequently, in orders dated December 6 and 13, 1973, this Court ordered that all members of the Plaintiff class still confined in the segregation units be released to the general population of the prison because their continued confinement constituted punishment disproportionate to the offenses charged during the rehearings and was, thus, in contravention of the Eighth Amendment's prohibition against cruel and unusual punishment. Adams v. Carlson, 368 F.Supp. 1050 (E.D.Ill., 1973).

■ This Court preliminarily enjoined the Defendants from rejecting for mailing certain letters written by the Plaintiffs generally depicting prison conditions and giving their opinions concerning how they felt they were being treated, merely because the Defendants did not deem the letters to be truthful. Neither party has offered any new evidence regarding this issue. Thus, the Court feels that the preliminary injunction should become permanent. Accordingly, it is ordered that the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order, be and they are hereby permanently enjoined from rejecting for mailing, letters, not otherwise objectionable, by members of the Plaintiff class to family and friends, which contain the inmate's depiction of conditions and events in the prison, and his own thoughts about them, merely for the reason that the Defendants do not deem the letters to be truthful.

The Court also reaffirms its prior order that the attorneys of members of the Plaintiff class shall not be required to confer with their clients in a partitioned room.

The issues remaining for determination are as follows: (1) what shall constitute the appropriate class for this litigation and does this Court retain jurisdiction over those members of the Plaintiff class who have been transferred to other institutions beyond the jurisdiction of this Court; (2) whether the Defendants complied with the Due Process standards for in-prison disciplinary hearings enunciated by the Seventh Circuit in Miller v. Twomey, 479 F.2d 701 (7th Cir., 1973) and as supplemented by this Court in its September 7, 1973, order, and whether those standards should be further supplemented or clarified; (3) whether it is necessary to expunge

the prison records for any members of the Plaintiff class; and (4) whether the Court should grant the request of the attorneys for the Plaintiffs for reasonable attorneys' fees and expenses.

■ Initially, the Court notes the well-established proposition that questions of internal prison discipline are not ordinarily matters for examination by federal courts, but it is well-established that judicial review is required when questions of constitutional deprivation are brought into issue. Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1972).

### APPROPRIATE CLASS

■ This Court had previously certified this litigation as a class action brought on behalf of those inmates placed in segregation at Marion as a result of the July, 1972, work stoppage. Plaintiffs now contend that those due process safeguards which are constitutionally mandated should be applied to all inmates presently confined in the H and I segregation units at Marion. Plaintiffs contend that if the Court defines the class, for the purpose of due process, to include all inmates who have been placed in punitive segregation without constitutional hearings, the Court could avoid the unnecessary burden of ruling on numerous individual pieces of litigation. Plaintiffs, in essence, seek to modify the class after the conclusion of all hearings in this matter. The Court feels that it would be inappropriate to change the class at this late date. There is no evidence regarding what due process safeguards were afforded inmates currently in segregation who are not currently members of the Plaintiff class. Thus, the Court feels that as to these inmates it could not make an informed determination concerning whether they had been afforded adequate due process safeguards and whether it would be necessary to ex-

punge their records. Therefore, the Court feels that the appropriate class is that class which the Court previously authorized, i. e., those inmates placed in segregation pursuant to their alleged participation in the July, 1972, work stoppage.

■ Some of the Plaintiffs have been transferred from this judicial district to other penal institutions. Counsel for Plaintiffs assert that this Court retains jurisdiction over all members of the original Plaintiff class and that the order of this Court should apply to all its members. The Court agrees.

One of the Defendants in this case is Norman A. Carlson, Director of the Federal Bureau of Prisons, who has direct responsibility for and control over the policies and practices of the Federal Bureau of Prisons. This order is applicable to him and he has the power to carry it out in any federal institution on behalf of any prisoner under his jurisdiction. Clearly the Bureau of Prisons does not have the power to circumvent the orders of the Court of Appeals and of this Court by transferring some of these Plaintiffs to other federal institutions.

In Theriault v. Carlson, 353 F.Supp. 1061 (N.D.Ga.1973), the court issued an order applicable not only to those outside the judicial district who were plaintiffs at the suit's inception, but also to all other federal prisoners who subsequently fit into the definition of the class. That court rejected the argument advanced by the Defendant Bureau of Prisons that the court did not have jurisdiction to issue and enforce an order against Defendant Norman Carlson which would affect Bureau of Prisons institutions outside its own judicial district.

Clearly there can be no question that the court had jurisdiction to order defendants Carlson and Silver to direct prison authorities under their control to grant petitioners the right to freely exercise their religion. The court assumed jurisdiction of this ac-

tion under 28 U.S.C. § 1361 and venue was provided by 28 U.S.C. § 1391(e)(4). The fact that defendants' subordinates resided in judicial districts located in other parts of the country did not obviate defendants' duty to comply with the court's order. There is nothing novel about a court order which directs an administrator to make certain changes in the organization under his control, and whose implementation ultimately affects subordinates who are beyond the geographical limits of the court's district. See Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); Anderson v. Ellington, 300 F.Supp. 789 (M.D.Tenn. 1969); Adderly v. Wainwright, 46 F. R.D. 97 (M.D.Fla.1968); Wilson v. Kelley, 294 F.Supp. 1005 (N.D.Ga. 1968), aff'd 393 U.S. 266, 89 S.Ct. 447, 21 L.Ed.2d 425; Lee v. Macon County Board of Education, 267 F. Supp. 458 (M.D.Ala.1967), aff'd 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422; United States v. State of Texas, 321 F.Supp. 1043 (E.D.Tex.1970), aff'd 447 F.2d 441 (5th Cir.); United States v. State of Georgia, 428 F.2d 377 (5th Cir. 1970); Peoples v. United States Department of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561 (1970). *Id.* at 1066.

■ The proper class for this litigation is the class of inmates who were placed in segregation after their alleged participation in the July, 1972, work stoppage, regardless of where they are now confined.

### DUE PROCESS

Plaintiffs claim that they did not receive hearings accompanied by the proper prophylactic procedures which the Constitution's due process clause mandates prior to their placement in punitive segregation. All the Plaintiffs have been released from the segregation imposed pursuant to the July, 1972, prison work stoppage. Under ordinary circumstances, the issue of whether they had been accorded proper procedural safeguards might be moot. In the instant case, however, the Plaintiffs have asked that their records be expunged because they continue to be penalized as a result of having these rule infractions in their prison file. Before the Court can determine the issue of expungement, it must first determine the procedural safeguards which should be accorded to inmates at a prison disciplinary hearing and then determine whether these Plaintiffs received those safeguards at their hearings.

The Court of Appeals has held that prolonged punitive segregation does constitute a grievous loss (*Miller* at 717) and that before an inmate may be subjected to such a grievous loss, he must be afforded certain minimal due process safeguards, including, but not limited to, the following: (1) an adequate and timely written notice of the charges; (2) a fair opportunity to explain; (3) a fair opportunity to request that witnesses be called or interviewed; and (4) an impartial decision-maker. *Miller*, at 718. In its September 7, order, this Court clarified these standards by requiring that an inmate be given written notice at least twenty-four (24) hours prior to the hearing of the specific charges and rules or regulations allegedly violated. A "fair opportunity to explain" was clarified as requiring that an inmate be informed of the evidence against him and that he then have the opportunity to explain his version of the incident and to raise any relevant defenses or reasons for his actions or inaction. In that order this Court also provided as follows:

"(c) A 'fair opportunity to request that witnesses be called or interviewed' includes the responsibility on the part of the accused to make some showing that the testimony of the requested witnesses is relevant and material to the charges and reasonable under the circumstances.

(d) No person who reported, investigated or was in any other way involved in the alleged infraction or charge against an inmate shall take part in the decision-making process.

(e) Upon concluding the hearings, the decision-maker shall make a written memorandum report of the hearings and the decisions. Such memoranda, in addition to meeting the requirements of the Marion Federal Prison Policy Statement MI–7400.5c on Inmate Discipline, effective July 17, 1972, shall also include the names of witnesses requested by the accused who were neither called nor interviewed. The accused's statements as to the expected testimony from each such witness should be included together with the reasons for not calling or interviewing them. Reasons for interviewing rather than calling any requested witness should be set out together with any relevant information obtained from the interview, unless the disclosure of such reasoning and information would place the safety of any inmate in jeopardy."

▮ Initially, it should be noted that due process is a flexible concept which takes into account the importance of the interests at stake.

"Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands.

'[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected by governmental action.' Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safe-

guards call for the same kind of procedure." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

It is clear that some assurances of elemental fairness are essential when substantial individual interests are at stake. Nolan v. Scafati, 430 F.2d 548 (1st Cir., 1970).

In considering the safeguards that should be given to an inmate at a disciplinary hearing, the Seventh Circuit has held in determining whether to require due process, we need not choose between the "full panoply of rights accorded a defendant in a criminal prosecution, on the one hand, and no safeguards whatsoever, on the other. Rather, as *Morrissey* aptly illustrates, the requirements of due process may be shaped to fit the needs of a particular situation." *Miller*, at 713.

Additionally, in describing the minimum due process safeguards necessary for a prison disciplinary hearing, the appellate court noted.

"Plainly, an in-prison disciplinary proceeding may be at least as informal as a parole revocation hearing. Thus, there is *no absolute right* to confront or to cross-examine witnesses; it is doubtful that counsel or a lay substitute is essential. As a minimum, however, the prisoner must receive adequate advance written notice of the charges against him, he must be afforded a fair opportunity to explain his version of the incident, and, to insure a degree of impartiality, the factual determination must be made by a person or persons other than the officer who reported the infraction." (Emphasis added.) *Miller*, at 715–716.

That Court also held that the due process *minima* described in *Miller* should be applied retroactively to include the Plaintiffs in this action. *Adams*, 488 F.2d at 625.

▮ The Court of Appeals held that prolonged segregated confinement constituted a grievous loss which war-

ranted at least minimum due process safeguards, but added, "it does not inevitably follow that procedural safeguards must apply whenever an inmate is removed from the general population." *Miller*, at 717. At Marion, after an inmate is found to have committed a serious offense, he usually is placed in segregation for an indeterminate period of time. His status is then reviewed after ten (10) days and again every thirty (30) days thereafter and subsequently is released to the prison's general population only after the prison officials feel that he should be released. Thus, when an inmate is put in segregation, it is not certain whether he will be there for a prolonged period or a relatively short time. Since the Marion officials use indeterminate sentences, prison officials must give disciplinary hearings with due process safeguards whenever they seek to place an inmate in segregation. Nevertheless, prison officials may take immediate action to segregate any prisoner that they feel presents a real danger to the staff, the other inmates, or himself, but must give such prisoner a hearing complying with due process safeguards at the earliest reasonable time thereafter.

The issue of fairness and just treatment in terms of prisoner discipline is a critical one, both for the interests of the prison and the prisoner. Impartial, rational and justifiable punishment can have a positive effect on prisoner rehabilitation and a deterrent effect on prisoner conduct.

At the hearing, the prison experts agreed that it was important that the prisoner perceive the disciplinary hearing as a fair one.

Preliminarily, the Court wishes to make clear that the issue before this Court is what procedural safeguards does the due process clause mandate. The Court does not feel that it should substitute its judgment for that of prison administrators in determining the best procedures in managing a prison or rehabilitating inmates. The Court will concern itself solely with the question of what safeguards are constitutionally mandated.

There are many cases which have considered the issue of due process for in-prison disciplinary hearings. The relief which these courts have granted varies widely, and this issue is in a state of flux. Among those cases which this Court has considered, in reaching its determinations, but has not otherwise cited, include the following:

McDonnell v. Wolff, 483 F.2d 1059 (8th Cir., 1973); Remmers v. Brewer, 475 F.2d 52 (8th Cir., 1973); United States ex rel. Walker v. Mancusi, 467 F.2d 51 (2d Cir., 1972); Wright v. McMann, 460 F.2d 126 (2d Cir., 1972); Collins v. Hancock, 354 F.Supp. 1253 (D.N.H., 1973); Pearson v. Townsend, 362 F.Supp. 207 (D.S.C.1973); Gates v. Collier, 349 F.Supp. 881 (N.D.Miss., 1972); United States ex rel. Neal v. Wolfe, 346 F.Supp. 569 (E.D.Pa., 1972); Bundy v. Cannon, 328 F.Supp. 165 (D. Md., 1971).

Plaintiffs seem to treat the prison disciplinary hearing before the Adjustment Committee as an adversary proceeding. However, in a truly adversary hearing, such as a criminal trial, the government is represented by a prosecutor; formal rules of evidence are in force; a defendant enjoys a number of procedural rights which may be lost if not timely raised; and in a jury trial, a defendant must make a presentation to untrained jurors. On the other hand, an Adjustment Committee hearing is substantially different. There is no prosecutor, but rather an impartial investigator; formal rules are not utilized; and the members of the Committee are familiar with the problems and practice of prison administration and discipline.

Consequently, this Court finds that prison disciplinary procedures are not adversary proceedings. United States ex rel. Jones v. Rundle, 358 F. Supp. 939, 946 (E.D.Pa., 1973). Rather they are conducted by impartial factfinders who favor neither side, but seek the facts which favor both sides.

Courts have previously recognized that other Adjustment Committees are highly informal and are, thus, utilized as an administrative rehabilitative mechanism, although its deliberations do have a tone of judicial fact-finding. Braxton v. Carlson, 483 F.2d 933 (3rd Cir., 1973).

The Seventh Circuit previously required that the accused prisoner receive adequate advance, written notice of the charges against him. This Court clarified that requirement by saying that a prisoner must be given written notice at least twenty-four (24) hours prior to the hearing of the specific charges and rules or regulations allegedly violated. Plaintiffs now claim that such short notice effectively inhibits the inmate from preparing an adequate defense and they request written notice at least seventy-two (72) hours prior to the time of hearing. In Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal., 1971), the court found that the Constitution demands at least seventy-two (72) hours written notice. Other courts have indicated a reasonable interval is necessary without specifying the actual length. See, for example, Sands v. Wainwright, 357 F.Supp. 1062 (M.D.Fla., 1973), remanded 491 F.2d 417 (5th Cir., 1973); Sostre v. McGinnis, 442 F.2d 178 (2d Cir., 1971); cert. denied sub nom. Osward v. Sostre, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254; Diamond v. Thompson, 364 F.Supp. 659 (M.D.Ala., 1973).

This Court does not feel that 72 hours' prior notice is essential to insure fairness at the disciplinary hearing. The charges at a disciplinary hearing are relatively uncomplicated and usually result from recent alleged activities. The inmate will generally know who his witnesses are and it ordinarily should not take him more than 48 hours to locate them and question them regarding the incident. Thus, the Court holds that prisoners must be given adequate timely, written notice of the charges against them at least 48 hours prior to the hearing. The inmate may request a short continuance if special circumstances necessitate such a postponement. The granting of this request shall be at the sound discretion of the disciplinary hearing board. The written notice provided an accused inmate shall include the number of the rule violated, the name of one witness who viewed the incident or who wrote the disciplinary report, the investigating officer, if any, and a summary of the facts underlying the charge. If the accusor is another inmate, then it shall not be necessary to provide the accused inmate with the name of his accusor. In addition, Plaintiffs seem to request a list of all accusing witnesses. The Court does not feel that it is essential to provide the names of all witnesses of the alleged incident. Even a defendant at a criminal trial does not enjoy this right.

Plaintiffs also contend that the inmates shall have the right to confront and cross-examine their accusors subject only to limitations of relevancy. Plaintiffs do not contend they are entitled to these rights where an accusing inmate's life would be endangered by such a confrontation. It is clear from the testimony at the hearing that one inmate who testified against another would be placing his life in jeopardy. Accordingly, where an inmate is the accusor, it is certainly not necessary that he be called as a witness.

As noted earlier, the Seventh Circuit has already cast serious doubt about the necessity of requiring confrontation and cross-examination by saying, "Thus, there is no absolute right to confront or to cross-examine witnesses." *Miller*, at 715.

Defendants concede that confrontation would be desirable in a non-penal, free-world setting to insure fairness, but contend that in-prison disciplinary hearings have significant differences. The relationship between a criminal defendant and the witnesses opposing him and hostilities arising from the confrontation experience may ordinarily be diffused in numerous ways—sometimes by the action of the hearing officer or other au-

thorities, but more often by the fact that the individual affected, and those who have confronted him, may return to their respective homes, thereby avoiding any further contact. This separation does not occur in a typical prison setting. The inmate who contests the charges, against him, does not subsequently avoid his accusor. Hostilities sparked in a hearing may easily be fanned into flames in the close confinement of a prison. If staff witnesses are subjected to confrontation and cross-examination, their supervisory, counseling relationship essential to current correctional practices may be disrupted and destroyed as a result of the confrontation experience.

Some courts have held that confrontation and cross-examination are mandated by due process for a prison disciplinary hearing. See *Sands, supra,* Colligan v. United States, 349 F.Supp. 1233 (E.D. Mich., 1972); Landman v. Royster, 333 F.Supp. 621 (E.D.Va., 1971).

Nonetheless, this Court feels that the majority of courts which have considered this question and the better reasoning support the proposition that confrontation and cross-examination are not absolutely required. *Sostre, supra; Braxton, supra;* Palmigiano v. Baxter, 487 F.2d 1280 (1st Cir., 1973); Griggs v. Liethliter, 355 F.Supp. 1121 (N.D. Ill., 1973); Banks v. Norton, 346 F. Supp. 917 (D.Conn., 1972); Lathrop v. Brewer, 340 F.Supp. 873, 881 (S.D.Iowa, 1972); United States ex rel. Jones v. Rundle, *supra;* Lamar v. Coffield, 353 F.Supp. 1081 (S.D.Texas, 1972).

Thus, the Court concludes that confrontation and cross-examination are not constitutionally mandated. Prison officials may in their sound discretion decide whether accusors shall be subjected to cross-examination. If an accusor is called as a witness at the disciplinary hearing, then the accused inmate shall be allowed to cross-examine that witness.

■ At Marion, the usual practice is to appoint an investigator to determine some of the facts regarding the incident. While it is not necessary that an investigator be appointed, if one is selected he shall conform with the following guidelines: He must be impartial and shall have no personal knowledge of the incident. He shall interview all relevant witnesses for both sides subject to the limitation of reasonableness, i. e., the number of witnesses will generally not exceed four in number for either party. The investigator shall record a brief summary of what each witness tells him and make a notation of the date on which the investigator interviewed him. Such interviews shall be attached to the record of the proceedings and the findings thereof. Where there is a large number of hearings to be held in a short period of time, a sufficient number of investigators shall be appointed to insure a meaningful investigation of each incident.

■ Plaintiffs also request that the Court find that Due Process mandates the following:

The inmate shall have the right to present live testimony of witnesses (both inmates and guards) relevant to his defense, subject only to the limitation that they be of a reasonable number, not to exceed four in a normal hearing. The inmate will also be allowed to present any relevant documentary or tangible evidence, affidavits or statements which aid in his defense, and such evidence shall become part of the hearing record.

The Court feels that the above was inherent in its order of September 7, 1973, if the proposed testimony or evidence is relevant. The Court hereby adopts it as part of this order, finding it essential to the inmate's opportunity to explain his version of the incident. The exceptions to this conclusion of law is that prison officials may in their discretion choose to interview certain proposed witnesses, rather than calling them as witnesses before the Committee. The Court feels that interviewing these proposed witnesses should clearly be the exception rather than the rule and that unless

there are unusual circumstances, the proposed witnesses should be called to testify.

Plaintiffs also request that they be allowed representation of their choice, either by retained counsel, a volunteer law student from Southern Illinois University, or by a fellow inmate. The Seventh Circuit noted that an in-prison disciplinary hearing may be at least as informal as a parole revocation hearing and stated, "it is doubtful that counsel or a lay substitute is essential". *Miller*, at 715.

In *Morrissey*, which dealt with parole revocation, the Supreme Court did not reach the question of whether the parolee is entitled to the assistance of retained or appointed counsel. The Court subsequently answered that question in Gagnon v. Scarpelli, 411 U.S. 778, 93 S. Ct. 1756, 36 L.Ed.2d 656 (1973), when it held that in a probation revocation hearing, representation by counsel was not necessary in all cases, but the body conducting the hearing should decide in each case whether due process required that an indigent probationer be represented by counsel.

The *Miller* court, in discussing the procedural safeguards which are necessary before a prisoner may be placed in punitive segregation, also stated:

"Since we find a lesser interest in liberty and a greater state interest in summary disposition of in-prison disciplinary cases than of parole revocation matters, we believe *Morrissey* describes the maximum procedural safeguards required by the application of the due process clause to an in-prison proceeding." (Emphasis added). *Miller*, at 718.

Moreover, the Supreme Court in *Morrissey* even referred to the fact that summary treatment may be necessary in dealing with a large number of prisoners:

" . . . Although the parolee is often formally described as being 'in custody,' the argument cannot even be made here that summary treatment is necessary as it may be with respect to controlling a large group of potentially disruptive prisoners in actual custody." 408 U.S. at 483.

Accordingly, it would appear that fewer procedural safeguards are essential in an in-prison disciplinary hearing than for a probation revocation or parole revocation hearing.

Additionally, the issues confronting an accused inmate are relatively simple, i. e., did the inmate commit the recent offense. There are no formal rules of evidence or complicated procedures, which, if not exercised in timely fashion, would constitute a waiver of fundamental rights. Thus, it does not appear that legal training or expertise is necessary. It is also clear that requiring counsel could greatly prolong the decision-making process and add unnecessary financial burdens.

For all these reasons, the Court feels that the appointment of counsel or counsel-substitute is not constitutionally required. See also *Banks, supra,* at 919; *Jones, supra;* Williams v. Cannon, 370 F.Supp. 1243 (N.D.Ill., 1974).

This Court's September 7, 1973, order made clear that there must be an impartial decision-maker. It stated, "No person who reported, investigated, or was in any other way involved in the alleged infraction or charge against an inmate shall take part in the decision-making process." Plaintiffs also feel that the hearing officer should be a lawyer chosen from the local bar, who is not under the employ of the prison. The Court feels that the prison officials can function as impartial decision-makers and, thus, it is not necessary that a member of the local bar act as the decision-maker. On the contrary, the Court feels that it is beneficial to have as members of the decision-making board people with great expertise in the area of corrections.

Plaintiffs also request that the disciplinary hearing shall be taped or otherwise transcribed and said tape or transcription shall be attached to the

record of the hearing. The Court does not feel that due process mandates that the hearing be taped or transcribed. The records of the hearings, as submitted to the Court constitute sufficient records for prison disciplinary hearings.

After the Adjustment Committee finds that an inmate has committed a particular offense, the Committee will place the prisoner in segregation for an indefinite length of time. The prisoner's status is then reviewed periodically and he is released to the general population when the reviewing committee in its discretion feels that he should be. Plaintiffs contend that this policy of sentencing inmates to segregation for an indeterminate period is constitutionally defective, because it is violative of the Constitution's Due Process clause. Plaintiffs had previously claimed that the utilization of indeterminate sentences was violative of the Eighth Amendment's proscription against cruel and unusual punishment. The Seventh Circuit rejected that contention, saying as long as the question of whether an inmate should be continued in segregation is asked and answered "in an adversary setting identical to that which attended the initial placement of the inmate in segregation, we see no constitutional infirmity in a scheme of indefinite placement." *Adams, supra,* 488 F.2d at 635.

Thus, undaunted by their failure to convince the Court of Appeals that indefinite placement in segregation constituted a violation of the Eighth Amendment, Plaintiffs now seek to convince this Court that such indefinite placement in segregation violates the due process of the inmate. The Court feels that indefinite placement in segregation does not offend the constitutional guarantee of due process.

### EXPUNCTION

From the above discussion of the procedural safeguards constitutionally mandated for prison disciplinary hearings, it is clear that neither the original disciplinary hearings nor the re-hearings conducted for the 49 Plaintiffs still in seg-

regation in September, 1973, afforded the Plaintiffs all the due process safeguards which the Constitution demands.

Plaintiffs contend that all records of these disciplinary hearings should be expunged from their institutional files. They contend that having a record of those proceedings in their institutional files works to their detriment in other prison proceedings, including disciplinary hearings, good time forfeiture hearings and parole hearings.

The Tenth Circuit has held that there may be a continuing effect in penal institutions as a result of records denoting a confinement in segregation pursuant to a hearing without due process safeguards. In that case the court held that it should review that plaintiff's segregated confinement, although the prisoner had been released to another institution, unless such disciplinary records are expunged and not to be used against him. Black v. Warden, U. S. Penitentiary, 467 F.2d 202 (10th Cir., 1972).

The D. C. Circuit has also noted the continuing effect of disciplinary restrictions contained in the institutional file of a prison inmate:

> But the imposition of discipline will normally have two consequences: first, the punishment actually imposed; and second, the records maintained relating to that punishment. Appellant's disciplinary record may follow him throughout the prison system; if his punishment was without cause, he is punished anew each time his record is used against him. Burgett v. Texas, 389 U.S. 109, 115, 88 S. Ct. 258, 19 L.Ed.2d 319 (1967). Similarly, his disciplinary record may affect his eligibility for parole. (citations omitted) Hudson v. Hardy, 137 U.S.App.D.C. 366, 368, 424 F.2d 854, 856 (1970).

Another Court confronted with the question of expunction, analyzed the issue, as follows:

> " . . . The issue remains, therefore, as to whether such other effects as may flow from maintenance

of the records of the voided administrative convictions require expunction thereof. It appears that, as recited above, said effects are limited to the possibility of adverse consideration by either the Classification Committee or the Parole Board. In determining whether the Court should exercise its equitable powers in this regard, the Court must balance the factors militating for and against expunction . . . [A]lthough determination as to the propriety of expunction must be made on a case by case basis, the remedy of expunction is not one freely applied. In the present case, the use of these records by either the Classification Committee or Parole Board may have some relevance as to the plaintiff's attitude or security status in the same manner as unproven charges. Because the standards for such determinations are not known to the Court, and because the Court is without proper authority to interfere with those administrative decisions which are not on their face arbitrary or capricious, the Court is reluctant to expunge the records complained of.

Nevertheless, . . . 'practical problems may well face the plaintiff as a result of [such records,] and for this Court to deny some relief may compound those problems.' Balancing the interests, as the Court is required to do, it would seem appropriate and equitable that there be placed on the margin of said records a note which reflects that said convictions were voided under *Landman.* Such remedy, which is properly within the Court's discretion, may serve to insure that the records are at least given the appropriate legal weight." (citations omitted) Daniels v. Brown, 349 F. Supp. 1288 (E.D.Va., 1972).

 This Court finds the reasoning of the *Daniels* court persuasive. Since in the instant case the Plaintiffs have on their institutional files records of these disciplinary hearings which did not afford the Plaintiffs the requisite due process safeguards, the Court feels that some modification of those records is in order.

Counsel for the Plaintiffs argue that any reference to those invalid hearings and the segregation imposed pursuant thereto should be completely removed from their records. If the Court ordered this relief, it could cause innumerable future problems and confusion for prison administrators. There would be no indication of whether these Plaintiffs had been housed during the period they were actually in segregation. The Court feels that there is a compelling need to maintain adequate files and background reports for all inmates so that they may be properly classified, diagnosed, and treated. Thus, it would be inappropriate to order a complete destruction of all records pertaining to the Plaintiffs which mention the disciplinary hearings or the subsequent segregation.

The Court feels that the appropriate remedy would be one similar to that fashioned in *Daniels, supra.* Accordingly, the Court hereby orders that the Defendants make the following notation in the institutional file of each Plaintiff next to the Disciplinary Committee hearing: "A Federal court has found these hearings pursuant to which _____ (name) was placed in segregation to be invalid because _____ (name) was not afforded the proper due process procedural safeguards at the hearings."

 Plaintiffs also ask that this Court order new parole hearings for all those Plaintiffs who had parole hearings during the period that their institutional files contained records of these disciplinary hearings. Neither the U. S. Board of Parole nor any of its individual members is a defendant in this action. Accordingly, the Court feels that it does not have jurisdiction over the Parole Board to order it to conduct new hearings for these men.

## ATTORNEYS' FEES

 Counsel for the Plaintiffs request over $16,000.00 in attorneys' fees

and expenses incurred during this litigation. The Court has not appointed the attorneys to represent Plaintiffs, rather the attorneys undertook this representation of their own volition. These attorneys filed the initial complaint in this action. They maintain that this litigation has already resulted in substantial benefit to the Plaintiffs, including the following:

1. Elimination of censorship of legal correspondence;
2. Return of some confiscated legal materials;
3. Removal of phones as method of communication between Plaintiffs and counsel;
4. Release from punitive segregation of 36 Plaintiffs;
5. Establishing certain due process safeguards for prison disciplinary hearings; and
6. Expunging prison records of invalid prison disciplinary hearings.

The attorneys for the Plaintiffs argue that these benefits and others less concrete will accrue to benefit not only the prisoners but also the citizenry as a whole. These attorneys assert that it would be unfair to impose the cost of providing this benefit entirely upon the Plaintiffs' lawyers. They maintain that this cost should be borne by the citizenry, as represented by the Federal Government, who have received this benefit.

Plaintiffs rely upon two different theories for the award of attorneys' fees. The first is the Class Benefit Rationale, as enunciated in Mills v. Electric Auto-Lite, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), which held that where there was a substantial benefit to a class of stockholders, the costs of bringing the action should be distributed over all the shareholders by taxing those costs against the defendant corporation. The Supreme Court subsequently has awarded attorneys' fees in suits where certain democratic rights have been protected. See, for example, Yablonski v. U.M.W., 466 F.2d 424 (D.C.Cir., 1972), cert. denied, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973); Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). Several courts previously have awarded plaintiffs reasonable attorneys' fees in prisoner civil rights suits. Gates v. Collier, 489 F.2d 298 (5th Cir., 1973); Incarcerated Men of Allen County v. Fair, 376 F.Supp. 483 (N.D.Ohio, 1973); Diamond v. Thompson, 364 F.Supp. 659 (M.D.Ala., 1973); Holt v. Hutto, 363 F. Supp. 194 (E.D.Ark., 1973); Newman v. Alabama, (N.D.Miss., 1973). These cases all involved state prisoners with state officials as defendants. Plaintiffs have not cited nor has the Court been able to find any cases where attorneys' fees and costs have been awarded against Federal prison officials who were defendants in a similar action.

The other theory justifying attorneys' fees is the full and appropriate relief rationale, which holds that where a right has been created by the Constitution or by statute, courts should exercise their equity powers to fashion relief that will be effective in enforcing that right and appropriate under the circumstances of the particular case. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Mitchell v. DeMario Jewelry, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); J. I. Case Co. v. Borak, 377 U. S. 426, 84 S.Ct. 1556, 12 L.Ed.2d 423 (1964). Courts have held that where a constitutional or statutory right is largely dependent on private litigation for its enforcement, courts should award attorneys' fees to successful plaintiffs in appropriate cases to prevent that right from becoming meaningless for lack of enforcement. In Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), the Supreme Court described such a plaintiff as "a private attorney general".

Defendants cite 28 U.S.C. § 2412[1] as a bar to the award of attorneys' fees in

---

1. The relevant part of the statute reads as follows:

"Except as otherwise specifically provided by statute, a judgment for costs, as

suits against the United States Government or its officers, unless such award is specifically authorized by statute.

The Court of Appeals for the Seventh Circuit has had occasion to construe this statute in a case wherein the Court of Appeals reversed an award of attorneys' fees assessed against the Federal Savings and Loan Insurance Corporation. Cassata v. Savings and Loan Insurance Corp., 445 F.2d 122 (7th Cir., 1971). The Court stated as follows:

"Section 2412, *supra,* as presently constituted is a 1966 amendment of its predecessor Section 2412, enacted June 25, 1948, c. 646, 62 Stat. 973. The reviser's notes make it clear that the limitations imposed upon the liability of the United States for the payment of costs follows the established common-law rule that a sovereign is not liable for costs unless specific provision for such liability is made by law. This is a corollary to the rule that a sovereign cannot be sued without its consent.

"At the outset, therefore, it becomes apparent that prior to the enactment of Congressional legislation, the doctrine of sovereign immunity precluded successful private litigants from recovering costs against the United States. Section 2412, *supra,* removed that bar only as to certain prescribed items of costs, but specifically excluded attorneys' fees. This was merely a grant of power to the courts, allowing them to bind the sovereign within the narrow limits of its consent. It did not remove any power formerly lodged in the courts.

"A letter from the Attorney General to the Vice President quoted in the legislative history says: 'The bill makes it clear that the fees and expenses of attorneys and expert witnesses may not be taxed against the

United States.' See, 1966 U.S.Code Cong. and Adm.News, Vol. 2, p. 2531.

\* \* \* \* \* \*

"It has long been held that 'in the absence of a statutue directly authorizing it, courts will not give judgment against the United States for costs or expenses', and that this is a sovereign prerogative which cannot be waived. United States v. Chemical Foundation, 272 U.S. 1, 20–21, 47 S.Ct. 1, 71 L.Ed. 131 (1926); United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 513, 60 S.Ct. 653, 84 L.Ed. 894 (1940).

"Further, the bar of a judgment for costs against the United States under the doctrine of sovereign immunity presents a jurisdictional question which cannot be waived and may be first raised on appeal. United States v. United States Fidelity & Guaranty Co., *supra,* 309 U.S. at 514, 60 S.Ct. 653; North Atlantic & Gulf S.S. Co. v. United States, 2 Cir., 209 F.2d 487, 489 (1954)." *Id.* at 125–126.

The Court feels that the Defendants in this action are covered by this statute. They were clearly officials of the United States acting in their official capacities during the events which gave rise to this litigation.

Similarly, the Court of Appeals for the District of Columbia recently recognized that 28 U.S.C. § 2412 precluded the award of attorneys' fees and expenses against the Government. Wilderness Society v. Morton, 495 F.2d 1026 (C.A.D.C.1974). There the Wilderness Society, Environmental Defense Fund, and Friends of the Earth requested an award of attorneys' fees and expenses. The Court determined that it would be appropriate to assess attorneys' fees and expenses against the Defendants and an intervenor under the "private Attorney General" theory. The Court then held

enumerated in section 1920 of this title but not including the fees and expenses of attorneys may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or official of the United States acting in his official capacity, in any court having jurisdiction of such action . . . "

that the part of the fees which was properly allocable against the Government could not be assessed against that body because of the statutory bar. That portion of the fees in that case had to be borne by the plaintiffs.

In accordance with this cited authority the Court feels that Plaintiffs' motion for attorneys' fees and expenses shall be, and is hereby, denied.

It is so ordered.